UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

MALTA NIEVES, Individually and on behalf of
All Others Similarly Situated,

                Plaintiff,

v.                                  **DECISION AND ORDER**

                                            17-CV-561S

JUST ENERGY NEW YORK CORP,

                Defendant.

---

## I.    Introduction

Plaintiff and her proposed class of New York electricity customers of Defendant challenge improper pricing practices for electricity rates that Defendant imposed upon them (Docket No. 1, Compl.). At issue here is the variable rate clause in Defendant's contract, which states:

> "You will be charged at the Intro Price for the first 3 billing cycles from the Start Date. After the Intro Price period expires, you will be charged a Variable Rate per kWh. The Variable Rate will not change more than once each monthly billing cycle. <u>Changes to the Variable Rate will be determined by Just Energy according to business and market conditions</u> and will not increase more than 35% over the rate from the previous billing cycle."

(Docket No. 1, Compl. ¶ 24, Ex. A, Contract Terms & Conditions, Sec. 7.3 (emphasis added). Before this Court is Defendant's Motion to Dismiss (Docket No. 8)[1] the Complaint.

---

[1] In support of its motion, Defendant submits its attorney's Declaration, with exhibit (the contract executed by Plaintiff); Memorandum of Law, Docket No. 8. In response, Plaintiff submits her Memorandum of Law, Docket No. 14; her attorney's Declaration with exhibits (decisions in other cases), Docket No. 15. In reply, Defendant submits a Reply Memorandum, Docket No. 16.

Both sides then supplemented authorities, Docket Nos. 29, 35, 44 (Plaintiff's supplemental cases), 39, 43 (Defendant's supplemental cases). Defendant objected to Plaintiff's initial supplementation Docket

For the reasons stated herein, Defendant's Motion to Dismiss is granted.

## II. Background

This is a diversity[2] jurisdiction class action under New York contract law challenging terms of Defendant's utility supply contract (see Docket No. 1, Compl., Ex. A, Terms and Conditions Sec. 21, Governing Law, New York State law governs). Defendant is an independent energy supply company (or "ESCO"). In 1996, New York State deregulated the market for retail electricity supply, allowing ESCO, other than local utility companies to supply electricity, while the utility delivered the electricity. (Docket No. 1, Compl. ¶¶ 11, 13.) ESCOs do not need to file their rates for supplying electricity with the New York State Public Service Commission (id. ¶ 12).

A. Pleadings

Plaintiff alleges that Defendant engaged in a bait and switch scheme wherein Defendant charged low introductory per kilowatt hour rates for customers to sign with Defendant, promising to charge variable rates for electricity then, months later, increases the per kilowatt hour variable rate by exorbitant amounts (id. ¶ 15). Plaintiff signed with Defendant in January 2011 and Defendant charged her the introductory rate (id. ¶¶ 21-23). Plaintiff understood that the future variable rates would be based on market conditions (id. ¶¶ 22, 24, Ex. A), which Defendant would set "according to business and market conditions" (id. Ex. A, Sec. 7.3; see id. ¶ 24). Plaintiff contends that "any reasonable consumer would understand and expect that a variable rate based on

---

Nos. 30-31; see Docket No. 33, Order granting leave, while Plaintiff later filed responses to defense supplemental cases, Docket Nos. 40, 45.

[2] Plaintiff is a New York State resident, and alleges a class of New Yorkers, while Defendant is a Delaware corporation with its principal place of business in Toronto, Canada, Docket No. 1, Compl. ¶¶ 5, 6.

business and market conditions would be commensurate with the rates offered by the local utility and other ESCOs," that is the variable rate would be "reflective of the price of electricity on the market and the rates afforded by Ms. Nieves' former utility and other competitors in the market" (id. ¶ 25). She argues that a reasonable consumer also would expect that variable rate would reflect changes in the wholesale market price for electricity (id. ¶ 26), essentially the amount Defendant pays to obtain the supply.

Plaintiff alleges that in or around December 2010, Defendant's representative solicited Plaintiff to switch her electricity supplier to Defendant "with promises that Ms. Nieves would save money if she switched to Just Energy" (id. ¶ 21). Defendant charged Plaintiff with the contractual introductory rate and after the third billing period charged her a variable rate (see id. ¶¶ 23, 28). Plaintiff contends that Defendant charged variable rates that were not commensurate with the rates available in the market or with changes in the wholesale rates (id. ¶ 27). Plaintiff stayed with Defendant and paid higher variable rates until terminating her contract in April 2012 (id. ¶ 28).

She presents a comparison of the per kilowatt hour rate Defendant charged and the rates of her former utility supplier, National Grid from September 2011 to April 2012 (id.). Plaintiff, however, did not present the rates charged by Defendant's competitor ESCOs.

She makes claims for a class of Defendant's New York customers who were also charged variable rates from 2011 to the present (id. ¶ 39).

The First Cause of Action alleges Defendant breached its contract with Plaintiff (and other class members) in charging variable rates "that were not based on business and market conditions" (id. ¶¶ 44-49, 47). The Second Cause of Action alleges a breach

3

of the implied covenant of good faith and fair dealing in not basing Defendant's variable rates on changes in business and market conditions (id. ¶¶ 51-56). Plaintiff concedes here that Defendant had "unilateral discretion to set the variable rates for electricity based on market conditions" (id. ¶ 52). The Third Cause of Action alternatively alleges Defendant with unjust enrichment by setting variable rates Defendant "unjustly enriched itself and received a benefit beyond what was contemplated in the contract, at the expense of Plaintiff and other members of the Class" (id. ¶¶ 58-60, 58).

### B. Procedural History

Defendant eventually moved to dismiss (Docket No. 8). Responses to the motion was due on October 9, 2017, and replies by October 23, 2017 (Docket No. 10). The motion then was deemed submitted without oral argument. Defendant also moved to stay discovery during the pendency of this motion to dismiss (Docket No. 17) and this Court granted that stay (Docket No. 46, Order of Nov. 16, 2020).

### III. Discussion

#### A. Applicable Standards

##### 1. Motion to Dismiss

Defendant has moved to dismiss the Complaint on the grounds that it states a claim for which relief cannot be granted. Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court cannot dismiss a Complaint unless it appears "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). As the Supreme Court held in Bell Atlantic Corp. v. Twombly, 550 U.S. 554, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), a Complaint must be dismissed pursuant to Rule 12(b)(6) for

failure to state a claim upon which relief can be granted if it does not plead "enough facts to state a claim to relief that is plausible on its face," id. at 570 (rejecting longstanding precedent of Conley, supra, 355 U.S. at 45-46); Hicks v. Association of Am. Med. Colleges, No. 07-00123, 2007 U.S. Dist. LEXIS 39163, at *4 (D.D.C. May 31, 2007). To survive a motion to dismiss, the factual allegations in the Complaint "must be enough to raise a right to relief above the speculative level," Twombly, supra, 550 U.S. at 555; Hicks, supra, 2007 U.S. Dist. LEXIS 39163, at *5. As reaffirmed by the Court in Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009),

> "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' [Twombly, supra, 550 U.S.] at 570 . . . . A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Id., at 556 . . . . The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully. Ibid. Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."' Id., at 557 . . . (brackets omitted)."

Iqbal, supra, 556 U.S. at 678 (citations omitted).

A Rule 12(b)(6) motion is addressed to the face of the pleading. The pleading is deemed to include any document attached to it as an exhibit, Fed. R. Civ. P. 10(c), or any document incorporated in it by reference. Goldman v. Belden, 754 F.2d 1059 (2d Cir. 1985), such as Plaintiff's contract with Defendant (Docket No. 1, Compl., Ex. A; see Docket No. 20, Def. Atty. Decl. Ex. 1). In considering such a motion, the Court must accept as true all of the well pleaded facts alleged in the Complaint. Bloor v. Carro, Spanbock, Londin, Rodman & Fass, 754 F.2d 57 (2d Cir. 1985). However, conclusory allegations that merely state the general legal conclusions necessary to prevail on the merits and are unsupported by factual averments will not be accepted as true. New York

5

State Teamsters Council Health and Hosp. Fund v. Centrus Pharmacy Solutions, 235 F. Supp. 2d 123 (N.D.N.Y. 2002).

### 2. New York Contract Law and Unjust Enrichment

Briefly, under applicable New York law (see Docket No. 1, Compl, Ex. A, Sec. 21), a claim for breach of contract requires allegation of the existence of a valid agreement, adequate performance by the plaintiff, breach of that agreement by the defendant, and damages arising from that breach, see Harsco Corp. v. Segui, 91 F.3d 337, 348 (2d Cir. 1996) (Docket No. 14, Pl. Memo. at 6).  The only element at issue is allegation of breach of the agreement by Defendant.

The implied covenant of good faith and fair dealing is contained in all contracts, "under which neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract," Claridge v. N. Am. Power & Gas, LLC, No. 15-1261, 2015 WL 5155934, at *6 (S.D.N.Y. Sept. 2, 2015) (id. at 10).

Unjust enrichment is based upon the "equitable principle that person must not be enriched unjustly at the expense of another," 22A N.Y. Jur. 2d Contracts § 521 (2020). Under New York law, the plaintiff must allege that the defendant was actually enriched and possessed the property of the plaintiff.  This is not a catchall cause of action but arises only in the absence of a breach of contract or other tort where "circumstances create an equitable obligation running from the defendant to the plaintiff," id.  This cause of action is not viable where a valid contract exists between the parties or if the claim is duplicative of a breach of contract claim, id.

B. Motion to Dismiss Contentions

Defendant argues that Plaintiff fails to allege plausible claims for breach of contract and her other contract claims (Docket No. 8, Def. Memo. at 7-11). Although Plaintiff alleges in her Complaint Defendant's variable rates and National Grid's rates, Plaintiff fails to present the comparable rates of other ESCOs (id. at 7). In its Memorandum, Defendant lists the rates it charged and those of its ESCO competitors in September 2011, providing a per kilowatt hour range of $.0559 to $.0799 (with Defendant charging $.0595) (Docket No. 8, Def. Memo. at 5). Plaintiff thus failed to allege that Defendant's rate was "substantially higher" than the competitions and made conclusory statements about Defendant's rate (id. at 7-8). Plaintiff did not allege that Defendant's variable rate exceeded 35% of the prior billing cycle's rate, the only limit on the rate Defendant could charge under the contract (id. at 8).

Defendant next argues that Plaintiff misconstrues the contract, reading "market prices" into the term "business and market conditions" in setting variable rates (id.). Under the plain language of section 7.3, Defendant enjoyed the broad discretion to set variable rates (id.). Defendant argues that Plaintiff's theory would read the phrase "business conditions" out of the agreement (id. at 9).

Plaintiff responds that the entire phrase "business and market conditions" needs to be given full effect, with "market conditions" meaning to her Defendant's wholesale price and competitors' pricing (Docket No. 15, Pl. Memo. at 8). She points to a number of cases (federal and state) that rejected similar motions to dismiss for defendant ESCOs challenged in setting their variable rates (id. at 4 & n.3; Docket No. 15, Pl. Atty. Decl.; see Docket Nos. 29, 35, 44 (Plaintiff's supplemental authorities)).

7

This Court initially considers the first two contractual causes of action, then the third cause of action alternatively alleging unjust enrichment. The first two causes of action arise from the existence of Defendant's contract, while the unjust enrichment is precluded where a valid contract exists, <u>Adams v. Labaton, Sucharow & Rudoff LLP</u>, No. 07 Civ. 7017, 2009 WL 928143, at *7 (S.D.N.Y. Mar. 20, 2009); <u>Brown v. Brown</u>, 12 A.D.3d 176, 176, 785 N.Y.S.2d 417, 419 (1st Dep't 2004) (Docket No. 8, Def. Memo. at 11). A breach of contract may not be considered an unjust enrichment "unless a legal duty independent of the contract—i.e., one arising out of circumstances extraneous to, and not constituting elements of, the contract itself—has been violated," <u>Brown</u>, <u>supra</u>, 12 A.D.3d at 176-77, 785 N.Y.S.2d at 419, citing <u>Clark-Fitzpatrick, Inc. v. Long Is. R.R.</u>, 70 N.Y.2d 382, 389, 521 N.Y.S.2d 653, 656-57 (1987).

### C. Variable Rate Provision

Each of the three causes of action required Defendant to breach its duty to Plaintiff in how it imposed variable rates. The key clause is Section 7.3, Electricity Charge, of the Terms and Conditions of the contract, specifically declaring that

> "<u>Changes to the Variable Rate will be determined by Just Energy according to business and market conditions</u> and will not increase more than 35% over the rate from the previous billing cycle."

(Docket No. 1, Compl. Ex. A, Contract Terms & Conditions, Sec. 7.3 (emphasis added)). For her claims to survive dismissal, Plaintiff needs to allege plausibly that Defendant breached its duty in setting rates consistent with business and market conditions.

The parties disagree about the source and scope of "business and market conditions" to guide Defendant in setting its variable rates. Defendant appears to emphasize "business conditions" while Plaintiff focuses on "market conditions" as she defines them to be determined from wholesale prices paid by Defendant and its

8

competitors' charges. Plaintiff's definition of "market conditions" is a conclusory allegation. The text of Section 7.3 nowhere defines "business and market conditions" based upon wholesale prices paid by Defendant or the retail rates charged by its competitors.

The entire phrase "business and market conditions" is not defined in the contract and it is not a term of art. The absence of definition, however, does not render the agreement ambiguous. By its terms, Defendant determines the relevant business and market conditions and sets the variable rate accordingly. These conditions may include wholesale electricity costs and what Defendant's competitors are charging, but these conditions may also include incidental expenses, marketing, and the desired profit margin for Defendant's investors. Nothing in the text of the provision mandates particular items as business or market conditions. The agreement is silent as to what those conditions might be, or which ones are relevant for Defendant to use in setting rates. Plaintiff also does not allege representations made by Defendant in selling this program or negotiating the contract that defined or limited business and market conditions beyond the express terms of the contract.

The Second Circuit, in Richards v. Direct Energy Services, 915 F.3d 88 (2d Cir. 2019), addressed challenges to a similar variable rate provision. The defendant Direct Energy supplied electricity at an introductory rate which, if the plaintiff did not cancel, converted into a monthly variable rate, id. at 92, 94. That rate "may be higher or lower each month based upon business and market conditions," id. at 94, with no express factors for setting the variable rate. Plaintiff Gary Richards complained that the absence of a standard violated Connecticut unfair and deceptive trade practice law by not pegging

that rate to the defendant's procurement costs, id. at 92.  The Second Circuit disagreed, affirming the district court's grant of summary judgment for dismissal of claims of unfair trade practices and breach of contract by breaching the covenant of good faith and fair dealing, id. at 96[3].

The variable rate provision in that agreement gave that defendant discretion to set it based upon "business and market conditions," defined by the Second Circuit to include "achiev[ing] a target profit margin, match[ing] competitors' prices, and reduc[ing] customer losses, among other objectives.  As a matter of plain meaning, these sorts of considerations constitute 'business and market conditions,'" id. at 98 (citing Black's Law Dictionary (10th ed. 2014), defining "business" and "market"; U.C.C. § 2-723(1)).  The Second Circuit held that factors influencing variable rates "minimizing customer losses, reaching a target profit margin," were "ordinary business considerations," id. at 99 (citing Marcus Dairy, Inc. v. Rollin Dairy Corp., No. 05-cv-589, 2008 WL 4425954, at *7 (D. Conn. Sept. 24, 2008)).  The variable rate provision in Richards' contract did not suggest that it bore a direct relationship with that defendant's procurement costs, id. at 98.  The Second Circuit then acknowledged that the defendant had to exercise that discretion in good faith, id. at 99, quoting 23 Williston on Contracts § 63:22 (4th ed. 2018).  The court then rejected Richards' argument that the state regulated rates were the proper comparator; doing so would render electricity deregulation a nullity, id.  Despite arising from the motion for summary judgment (but cf. Docket No. 40, Pl. Response to Def.'s Notice of Supplemental Authority [Richards]), this Court finds persuasive the Circuit Court's analysis of business and market conditions contained in Richards.  The Second Circuit also noted other courts

---

[3]The Second Circuit also affirmed the grant of Direct Energy's motion to dismiss Richards' unjust enrichment claim, id. at 915 F.3d at 95-96.

10

had dismissed claims like Plaintiff's at the pleading phase, Richards, supra, 915 F.3d at 98 & n.6 (citing cases), and distinguished three cases[4] Plaintiff here cites (Docket No. 14, Pl. Memo. at 4 & n.3) because the absence of representations to Richards that "business and market conditions" would guarantee below-market rates, Richards, supra, 915 F.3d at 99 n.6.

Plaintiff, however, cites to numerous cases from federal and state courts with allegedly similar facts to this case in which motions to dismiss were denied (Docket No. 14, Pl. Memo. at 4 & n.3; Docket No. 15, Pl. Atty. Decl.; Docket Nos. 29, 35, 44 (supplemental authorities)), as did Defendant supplementing with authorities that dismissed or upheld the dismissal of claims similar to Plaintiff's (Docket Nos. 39, 43). As noted by the Southern District of New York in Claridge v. North American Power & Gas, LLC, supra, 2015 WL 5155934, at *5, however, these cases have limited persuasive value because each case turns on the terms and representations in that case (Docket No. 16, Def. Reply Memo. at 6). Some of those cases defined business or market conditions to include consideration of wholesale prices for electricity, Landau, supra, 223 F. Supp.3d 401 (variable rate tied specifically to wholesale market); Fritz v. North American Power & Gas, LLC, No. 14-634 (D. Conn. Jan. 29, 2015); Tully v. N. Am. Power & Gas, LLC, No. 14-634 (D. Conn. Oct. 29, 2015); Steketee v. Viridian Energy, Inc., No. 15-585 (D. Conn. Apr. 14, 2016); Sanborn v. Virdian Energy, Inc., No. 14-1731 (D. Conn. Apr. 1, 2015), including another case pending before this Court, Jordet v. Just Energy Solution, Inc., No. 18CV953 (W.D.N.Y.), Docket No. 1, Compl. ¶ 19 (variable rate set "according to

---

[4] Melville v. Spark Energy, Inc., No. 15-8706, 2016 WL 6775635, at *4 (D.N.J. Nov. 15, 2016); Landau v. Viridian Energy PA LLC, 223 F. Supp.3d 401, 418-19 (E.D. Pa. 2016); Mirkin v. Viridian Energy, Inc., No. 3:15-CV-1057, 2016 WL 3661106, at *6-7 (D. Conn. July 5, 2016).

11

business and market conditions, <u>including but not limited to, the wholesale cost of natural gas supply, transportation, distribution and storage</u>," emphasis added).  In another case, the defendant supplier set its variable rate based upon its "actual and estimated supply costs which may include but not be limited to prior period adjustments, inventory and balancing costs," <u>Mirkin v. Xoom Energy, LLC</u>, 931 F.3d 173, 175 (2d Cir. 2019) (reversing dismissal) (Docket No. 44, Pl. Supp'al Authority).  Other cases involve capped prices that the vendor could not exceed, <u>e.g.</u>, <u>Donnerfeld v. Petro, Inc.</u>, No. 17-2310, 2018 WL 4356727 (E.D.N.Y. Sept. 12, 2018) (Docket No. 36, Def. Response at 1, citing First Amended Complaint ¶ 9, reproduced at 2017 WL 6817368).  Still other cases involve other provisions of utility sales and service contracts, <u>e.g.</u>, <u>Rovner v. Just Energy Group, Inc.</u>, No. 18-cv-2159 (E.D.N.Y. July 31, 2019) (Docket No. 43, Def. Supp'al Auth.; <u>see also</u> Docket No. 45, Pl. Response to Def.'s Notice of Supp'al Auth. [<u>Rovner</u>], at 2-3).  These contracts are factually distinguishable from the one present in this case where business and market conditions are not limited by source.

        D. Breach of Contract and Breach of Implied Covenant of Good Faith

           1. Breach of Contract

As for the alleged breach of contract and applying the language used by the parties in this contract, Defendant has not breached that agreement.  What constituted "business and market conditions" was left to Defendant's discretion in setting the variable rates.  Those conditions were not defined merely to Defendant's wholesale costs or competitors' pricing.  As discussed in <u>Richards</u>, <u>supra</u>, 915 F.3d at 98-99, business and market conditions are not so confined absent language in the contract to the contrary.  The only restriction on that rate in the contract was that it could not exceed 35% of the previous

12

billing cycle rate. Nowhere did that provision require the variable rate not exceed what Plaintiff's prior utility charged.

The Complaint also does not allege contract negotiations or other representations that would lead Plaintiff to believe that the variable rate was tied either to the rate charged by competing ESCOs or utilities or to what Defendant's actual wholesale costs for acquiring electricity were, see Richards, supra, 915 F.3d at 99 n.6, despite her arguments that such "representations" clearly indicated that business and market conditions meant wholesale prices and competitors' pricing to her (or to a reasonable consumer) (cf. Docket No. 14, Pl. Memo. at 7-8 & n.4). She does not allege that Defendant represented that business and market conditions would guarantee below market variable rates, id. (distinguishing, e.g., Landau, supra, 223 F. Supp.3d at 418-19; Mirkin, supra, 2016 WL 3661106, at *6-7) (see Docket No. 14, Pl. Memo. at 4), or made any representation regarding variable rates once the discounted introductory rate expired. The only alleged representation was the sales presentation made around December 2010 that Plaintiff would save money if she switched to Defendant as her supplier (Docket No. 1, Compl. ¶ 21). Plaintiff did save money at least under the introductory rate. The express protection against so-called price gouging in the contract was the 35% maximum that any monthly increase could be from each billing cycle.

Therefore, Defendant's Motion to Dismiss (Docket No. 8) the First Cause of Action (alleging breach of contract) is granted.

### 2. Implied Covenant of Good Faith and Fair Dealing

As for the Second Cause of Action for breach of implied covenant of good faith, Plaintiff concedes that Defendant had unilateral discretion in setting the variable rate

(Docket No. 1, Compl. ¶ 52). Plaintiff then makes conclusory allegations that Defendant's rates were "substantially higher" than the rates of its competitors or the rates "actually based on business and market conditions" (id. ¶ 55), without alleging (1) what the competition's rates were (save comparison with her former utility), (2) what were the factors for business and market conditions, aside from claiming wholesale electrical rates, or (3) what the wholesale rates were. The fairness of the rates can be established only if the terms of the contract include that Defendant could charge only as much as its competition; the contract here, however, does not state this.

A similar contention was rejected in Richards, supra, 915 F.3d at 99. There, Richards argued that the defendant violated the implied covenant of good faith and fair dealing by offering a so-called introductory teaser rate and then charging higher variable rates. The Second Circuit held that Richards "received exactly what he bargained for," id. at 99-100, citing 23 Williston on Contracts § 63:22 ("there can be no breach of the implied promise or covenant of good faith and fair dealing where the contract expressly permits the actions being challenged, and the defendant acts in accordance with the express terms of the contract"). Plaintiff in the present case received what she bargained for; after the run of the introductory rate, Defendant set a variable rate, as expressed in the contract, based upon business and market conditions as found by Defendant.

Defendant's Motion to Dismiss (Docket No. 8) the Second Cause of Action also is granted.

### E. Unjust Enrichment

Under New York law, a plaintiff cannot allege an unjust enrichment where there is an existing contract, Clark-Fitzpatrick, Inc., supra, 70 N.Y.2d at 389, 521 N.Y.S.2d at 656-

57. Plaintiff counters that she is alleging this cause of action in the alternative under Federal Rule 8(d)(2) (Docket No. 14, Pl. Memo. at 13). Defendant replies that cases Plaintiff cited did not support her unjust enrichment claim while a valid contract exists (Docket No. 16, Def. Reply Memo. at 8, citing cases).

Rule 8(d)(2) allows for alternative pleading, either in a single count or in separate ones, Fed. R. Civ. P. 8(d)(2). "If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient," id.

Viewing Plaintiff's unjust enrichment claim separately from the contract, Plaintiff has not alleged that Defendant had a legal duty independent of that contract in setting its variable rates. That rate setting (at whatever amount) solely arises from the contract. Plaintiff's failure to allege any representations outside of the contract about rate setting is fatal to her claim for unjust enrichment. The legal duty Plaintiff invokes for her unjust enrichment claim is the same duty under the implied covenant of good faith and fair dealing that arises from the contract.

Plaintiff implies that the only reason a consumer would change from the electric utility to an ESCO is if they represented that the variable rate would either track wholesale costs or be competitive with other ESCOs' and utility's retail rates. This expectation (however conclusory) does not create a duty upon Defendant to charge variable rates consistent with this undocumented expectation. Any such duty arises from the underlying contract. The existence of a contract destroys an unjust enrichment claim.

Defendant's Motion to Dismiss (Docket No. 8) the Third Cause of Action for unjust enrichment (and consequently the entire Complaint) is granted.

## IV.     Conclusion

Plaintiff's understanding or what a reasonable customer might expect are not the terms of the contract she signed with Defendant.  That agreement gave Defendant discretion to set variable rates according to business and market conditions, without specifying business or market conditions to be considered.  Deregulation of electricity supply rates moved the marketplace from regulated monopoly (with rates set by National Grid, for example, as approved by the New York State Public Service Commission) to those set in the marketplace by ESCOs like Defendant.  Defendant, as an ESCO, did not have its rates set by a public agency or by its competitors (including utilities like National Grid).  Of course, Defendant could have set rates tied to its costs from the wholesale market or tracking what its competitors charged but the terms of the contract do not require this.  Defendant could set its variable rates on any basis it chose.  Its contract with Plaintiff (and other potential class members) did not restrict the basis for this rate setting.

Defendant's Motion to Dismiss (Docket No. 8) is granted.  As noted in the Order staying discovery (Docket No. 46, Decision and Order of Nov. 16, 2020, at 10), with this dismissal of the case, any discovery is denied.

## V.     Orders

IT HEREBY IS ORDERED, that Defendant's Motion to Dismiss (Docket No. 8) is GRANTED.

FURTHER, the Clerk of Court is DIRECTED to close this case.

SO ORDERED.


Dated:   November 19, 2020
         Buffalo, New York


                                        s/William M. Skretny
                                        WILLIAM M. SKRETNY
                                        United States District Judge